IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| TRACY MILLER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:19-cv-02152-JTF-cgc |
| ) | JURY DEMANDED |
| CANADIAN NATIONAL RAILWAY CO. and ) | Judge John T. Fowlkes, Jr. |
| ILLINOIS CENTRAL RAILROAD CO., ) | Mag. Judge Charmiane G. Claxton |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

Plaintiff TRACY MILLER ("Miller"), for his Second Amended Complaint against Defendants CANADIAN NATIONAL RAILROAD CO. ("CN") and ILLINOIS CENTRAL RAILROAD CO. ("IC"), states as follows:

### I. Summary of Claims

1.     Miller was employed by IC and CN since 1994. He was the highest ranking African-American employee of Defendants in the United States and, upon information and belief, in all of CN's railway Operations Department at the time he gave his two-week notice of resignation on January 28, 2019, which he gave because he was continually passed over for promotion in favor of white employees.

2.     Miller brings this action because:

(a)     he was denied promotion on multiple occasions to the position of Vice President, Operations, including in August 2018 because of his race in violation of 42 U.S.C. § 1981 ("Section 1981");

(b)     Defendants are preventing Miller from working in his chosen career for another railroad in the very position Defendants repeatedly have denied him by threatening to

1

enforce a non-competition restrictive covenant against Miller when it has not enforced the same covenant against similarly-situated non-black employees, and in retaliation for suggesting to Defendants that his race has been a factor adversely affecting his employment opportunities, in violation of Section 1981;

   (c) Defendants are intentionally and tortiously interfering with Miller's business relationship by preventing him from working in his chosen career for another railroad in the very position Defendants repeatedly have denied him by arbitrarily and discriminatorily threatening to enforce a non-competition restrictive covenant against Miller but not against similarly situated non-black employees, in violation of the common law of the State of Tennessee; and

   (d) Defendants have retaliated against Miller by suing him in this lawsuit and seeking over $1 million in damages only after he engaged in the statutorily protected activities of bringing this suit alleging employment discrimination and retaliation in violation of Section 1981 and filing a race discrimination and retaliation charge with the EEOC, and even though Defendants were aware of the facts which form the basis for their counterclaims in January 2019.  Defendants have brought the counterclaims to intimidate and punish Miller for filing this lawsuit and his EEOC charge.

## II.  Parties

 3. Miller is an African-American citizen of the United States.  He is 50 years old, has been married since 2001, and has two daughters, ages 12 and 14.

 4. Miller is a graduate of LeMoyne Owen College, with a Bachelor of Science degree in Mathematics.

5. Miller has been a citizen and a resident of Shelby County, Tennessee since April 2016.

6. CN is a publicly held Canadian corporation registered under the laws of the Province of Quebec, with its principal place of business in Montreal, Canada. CN is Canada's largest railroad in terms of both revenue and the scope of its rail network, with over 20,400 route miles of track and revenues of over C$14 billion in Fiscal Year 2018. CN operates its rail network in Canada and the United States. CN also operates a trucking division, supply chain and logistics division and an intermodal division and employs over 24,000 employees.

7. IC is an Illinois corporation with a place of business in Memphis, Tennessee, located at 297 Rivergate Road. IC is a Class II railroad that operates in the United States. IC was acquired by CN on or about July 1, 1999 and is one of CN's wholly owned subsidiaries in the United States.

8. Defendants can be served via their registered agent, Corporation Service Company, located at 2908 Poston Avenue, Nashville, TN 37203.

### III. Jurisdiction and Venue

9. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 as to Miller's claims of discrimination arising under 42 U.S.C. § 1981.

10. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as to Miller's claims arising under Tennessee state law.

11. Venue is proper because Defendants have done and regularly do business in this judicial district, the events giving rise to this action occurred in this district, and Miller resides in this district.

## IV. Facts

12. Miller spent his entire professional career working in railroad operations for Defendants.

13. Miller began working for IC on or about September 1, 1994 when he was hired for its management training program.

14. From 1994 to April 2016, Miller held and performed almost all management level positions in the Operations Department below the level of Vice President, Operations. During this period, Miller had to relocate twelve times to different locations throughout North America.

15. After completing the management training program, Miller worked as a Trainmaster in Fulton, KY, Jackson, MS, and Baton Rouge, LA from 1994-1998.

16. From 1998-1999, Miller was the Director of Network Operations, first in Homewood, IL and then in Troy, MI.

17. From 1999-2001, Miller was Terminal Superintendent in Flint, MI.

18. From 2001-2003, Miller held the position of Superintendent.

19. From 2003-2005, Miller held the position of General Superintendent for the Operations Center in Homewood, IL

20. In 2005, Miller was relocated to Stevens Point, WI as General Superintendent.

21. On January 1, 2006, Miller was promoted to General Manager. Miller never received another promotion from CN. However, CN relocated Miller laterally in the position of General Manager five times, as follows:

   (a) To Troy, MI on September 1, 2006;

   (b) To Edmonton, CA on March 15, 2009;

   (c) To Toronto, Ontario, Canada on May 15, 2011;

    (d)  To Chicago, IL on April 1, 2014; and

    (e)  To Memphis, TN on April 20, 2016.

  22.  Miller's job performance, interpersonal skills and commitment were highly regarded by his peers and superiors. His performance reviews as General Manager consistently stated that he met or exceeded expectations, including his 2017 performance review, which stated that he exceeded expectations. He was never disciplined.

  23.  African-Americans have been under-represented in management positions in the Operations Department and have not been promoted at the same rate as white employees throughout Miller's employment with Defendants.

  24.  In 2004, a class action lawsuit entitled <u>Barnes v. Canadian National Railway Corporation et al.</u>, Case No. 1:04-CV-01249, was brought against CN and IC, among other affiliated entities, in the United States District Court for the Northern District of Illinois alleging that African-American managers and non-managers in multiple positions were denied promotional opportunities and were harassed throughout the CN system because of their race, in violation of federal civil rights laws. The case ended in 2010 with the entry of a Consent Decree requiring CN to pay $3 million and engage in various remedial actions.

  25.  When Miller was relocated to Memphis, Tennessee in April 2016, Defendants were responding to multiple claims of racial discrimination complaints in employment throughout the South, including in Memphis, Tennessee and Jackson, Mississippi. Miller believes he was relocated to Memphis to head up the Gulf Division (which included Memphis and Jackson) because he was Defendants' only African-American General Manager and Defendants wanted the favorable optics of having an African-American General Manager managing that division in light of the multiple claims of discrimination in the division.

26. While Miller was being relocated multiple times in lateral moves after becoming a General Manager on January 1, 2006, white General Managers were being promoted to the position of Vice President, Operations when those openings occurred.

27. Miller held the position of General Manager for more than 12½ years and was not promoted to Vice President, Operations. During this same period, Defendants promoted at least five white individuals to Vice President, Operations, each of whom had only between 1 and 8 years of service as General Manager, including as follows:

    (a) Mike Cory was promoted to Vice President, Operations 1 year after becoming a General Manager. Cory was promoted to Vice President, Operations in 2007;

    (b) John Orr was promoted to Vice President, Operations 7 years after becoming a General Manager. Orr was promoted to Vice President, Operations in 2013;

    (c) Michael Farkouh was promoted to Vice President, Operations 8 years after becoming a General Manager. Farkouh was promoted to Vice President, Operations in 2015;

    (d) Doug Ryhorchuk was promoted to Vice President, Operations 5 years after becoming a General Manager. Ryhorchuk was promoted to Vice President, Operations in June 2016; and

    (e) Derek Taylor was promoted to Vice President, Operations 6 years after becoming a General Manager. Taylor was promoted to Vice President, Operations in August 2018.

28. Including his promotion to General Manager, Cory was promoted five times in 10 years, with four of those promotions occurring in less than 3 years.

29. Including his promotion to General Manager, Orr was promoted five times in 12 years.

30. Including his promotion to General Manager, Farkouh was promoted three times in 8 years.

31. Including his promotion to General Manager, Miller was promoted just once in 12½ years.

32. Defendants engaged outside consultants to evaluate Miller's leadership potential and development on several occasions. After one of those evaluations, HR officials Suzanne Fusco and Leslie Anne Lewis, along with then Vice President John Orr, conducted a conference call with Miller to debrief. Orr was asked specifically what else Miller needed to do to become qualified for the position of Vice President, Operations. Orr responded that Miller did not need to do anything else.

33. After Defendants once again passed Miller over for promotion to Vice President, Operations in 2016, he engaged in several discussions with Vice President, Human Resources Kim Madigan, in which he expressed his frustration and disappointment with the stagnation in his career.

34. Over time, Miller became disillusioned, frustrated, and depressed as he watched his white co-workers promoted from General Manager to Vice President, Operations, and then higher positions, all while Miller remained stuck in the position of General Manager. Miller felt a deep loyalty to Defendants but also felt discouraged and betrayed by his lack of progression compared to his white co-workers.

35. For these reasons, in 2017, Miller began discussions with his financial planner about his ability to retire from Defendants. However, Miller decided to remain employed with Defendants in the hope that he would receive the next promotion to Vice President, Operations.

36. On August 11, 2018, John Orr informed Miller that Orr was being promoted from Vice President, Operations, to Chief Transportation Officer. Instead of promoting Miller to the Vice President of Operations, Southern Region position Orr was vacating, Defendants promoted Derek Taylor to fill this position. Taylor was hired by Defendants in 2000. Miller was hired in 1994. Taylor had been a General Manager since July 2012. Miller had been a General Manager since 2006. Taylor is white. Miller is black.

37. During the August 11 conversation, Miller expressed great frustration about not being promoted to the position Orr had vacated. Orr told Miller that he knew Miller would just "go home, kick the cat, and go back to work the next day as if nothing had happened," or words to that effect. Shortly after midnight on August 12, 2018, Miller sent Orr an email expressing disappointment about being passed over and resentment for being used by the company when they sent him to Memphis in 2016 because of his race. A copy of Miller's email is **Exhibit A**.

38. A day or two later, Vice President, Human Resources Madigan called Miller to ask how he was holding up. Miller also expressed frustration to her about being passed over for promotion.

39. Over the next few weeks, Orr discussed with Miller the possibility of moving to a position that had been created for him in the Safety Department with the title of Assistant Vice President. It would require Miller to move out of the Operations Department and relocate to Chicago. Miller did not view the position favorably, considered it a lateral transition at best because it did not include any raise in salary or benefits, and believed it would not advance his career. He made his feelings known to Orr.

40. On about September 27, 2018, Miller received a letter appointing him Assistant Vice President of Safety and Regulatory Affairs. A copy of the letter is **Exhibit B**. Consistent

with Miller's understanding, the new position was not a promotion. Miller was not given an increase in compensation or benefits and the title of Assistant Vice President is not a graded position within Defendants' organization. The letter also confirmed that the new position would require Miller and his family to relocate again, this time to Homewood, Illinois, a suburb of Chicago, by August 2019. In his position of General Manager, Miller had about 600 employees under his authority. In the position of AVP, Safety, he had about 30 employees under his authority. In the new position, Miller would be reporting to Mitch Beekman, Vice President, who had been hired about two years earlier. Beekman is white.

41. Miller did not believe he had any choice but to accept the position. He formally assumed the new role effective September 27, 2018. He was replaced as General Manager, Gulf Division by a white individual.

42. In October or November 2018, Miller contacted Human Resources officials Louis Lagace about the offer letter and his dissatisfaction that it was another lateral move and not a promotion. Lagace told Miller that CN Executive Vice-President and Chief Operating Officer Mike Cory would follow up with him.

43. A few weeks later, Madigan contacted Miller by telephone, during which she asked him about his concerns regarding the offer. Miller expressed frustration with having to relocate from Memphis to Homewood since the position was not a promotion and offered no opportunity for advancement. Miller indicated under the circumstances he preferred to stay in Memphis. Madigan said she would make inquiries, and Miller emphasized that he wanted an answer as soon as practicable.

44. On December 13, 2018, Miller spoke with Cory in Montreal. Miller told Cory that he felt insulted and was close to quitting. Cory told him to stick with it and take the job. Cory

9

also assured Miller that the appointment letter describing the new position was "wrong" and he would fix it. Cory never got back to Miller and the letter was not changed.

45. Throughout December 2018, Miller continued to reflect on his career with Defendants and reconsidered retirement. He instructed his financial planner to prepare a "walk-away analysis."

46. On January 8, 2019, an official from Canadian Pacific Railway ("CP") contacted Miller, unsolicited, about potential employment with CP. After several conversations, on January 17, 2019, CP offered Miller the position of Vice President, Operations in the U.S. This is the counterpart at CP of the position that Defendants had not given Miller in August 2018 and on four prior occasions. CP's operations in the United States are geographically different and smaller than CN's.

47. Miller did not accept CP's position when it was offered. He continued to weigh his options.

48. On January 21, 2019, Miller exercised stock options he had earned and been awarded three or more years earlier under the CN Management Long-Term Incentive Plan ("MLTIP").

49. Later that same day, Madigan and CN's compensation director, Francois Jauvin, called Miller to inquire if he was leaving the company given that he exercised his options. Miller said no. Miller did not believe he had any obligation to inform Madigan whether he was or was not leaving CN. Miller had not accepted the position with CP at this point.

50. After Mr. Jauvin dropped off the phone call, Madigan commented that Miller "seemed sad," and asked what was wrong. Miller again expressed his frustrations with the lack of a promotion, no raise, and the requirement that he relocate his family. Madigan replied that when

she previously spoke with Mike Cory, he stated that Miller was happy with his new job. Miller responded that he felt the new job was given to appease him, so he would not quit and file a discrimination claim against Defendants. Madigan responded, "I don't think so."

51. On January 22, 2019, Defendants sent Miller a letter reminding him of "confidentiality obligations and other restrictive covenants" found in the MLTIP. A copy of the letter is **Exhibit C**.

52. On January 28, 2019, Miller called Madigan to say he would be resigning and was giving his two-week notice. Madigan suggested that Miller take 30 days or wait until the end of the week to resign. Miller said he had been thinking about this decision for more than three years and was not changing his mind. At one point, Madigan asked Miller if he was prepared to sit at home and not work for two years, referencing a non-compete restrictive covenant that was contained in his annual stock option and Performance Share Units ("PSU") award letters. Miller responded he expected to be treated the same as other employees who had left Defendants subject to non-competes but were allowed to continue their careers with competing railroads. Madigan said that Defendants would not release him from his non-compete. Miller sent Madigan an email after their conversation. A copy is attached as **Exhibit D**.

53. The next day, January 29, 2019, Miller arrived ready to work but was told to leave the premises. Unknown to Miller, his employment was terminated by CN without cause effective January 28, 2019, which is prior to the date Miller had intended to resign.

54. Miller did not remove any records, documents, or property belonging to Defendants, and Defendants have no reason to believe otherwise.

55. On January 31, 2019, Miller emailed Madigan to advise that he had accepted employment at CP. A copy of the email is **Exhibit E**. Miller was scheduled to begin employment with CP on February 12, 2019 as Vice President of Operations for the United States.

56. On February 1, 2019, CN's counsel sent a letter to Miller advising him he was "[i]n breach of [his] contractual obligation not to compete against CN for two years after [his] employment by CN ceases." The letter accused Miller of fraudulent misrepresentations and demanded that he not begin employment with CP (or any other competitor), or CN would initiate legal action to prevent him from working for CP. CN demanded that Miller repay the monies he realized upon the sale of his stock options and threatened him with exemplary damages "if we are forced to litigate." The letter from CN's attorney is **Exhibit F**.

57. Miller is not prohibited under the MLTIP or under any other plan or document from exercising his vested stock options before he resigns his employment with CN.

58. Due to CN's threats, Miller withdrew his acceptance of employment at CP and did not begin employment with CP in the position of Vice President of U.S. Operations, all of which was known to CN.

59. Miller is informed and believes that similarly-situated employees who have left CN and are subject to the same non-competition covenant as Miller have been allowed to go to work for competitors (who would be covered by the non-compete) without being required to return any options or PSU's they had exercised before they left CN. All of the individuals are white. They include:

(a) Jim Schwictenberg, former CN Senior Director of Regulatory Affairs and Director of Safety and Regulatory, left Defendants in May 2018. He then became Vice President of Safety at CSX, a Class I railway, performing the same duties he performed at CN;

(b) Jamie Boychuck, former CN General Manager, left Defendants in March 2017 and shortly thereafter began employment with CSX as Assistant Vice President of Transportation;

(c) John Layne, former Assistant Superintendent, left Defendants in July 2017 to become a superintendent with CSX, performing the same duties he performed at CN;

(d) Ed Steinbeck, former Assistant Superintendent, left Defendants in February 2015 and shortly thereafter became a superintendent with CP;

(e) Hudson "Hunt" Cary left Defendants in October 2018 to work for Union Pacific Railroad, another Class I Railway;

(f) Mike Farrell, former General Superintendent of Operations, left Defendants in March 2013 to work for CP as General Manager, a role very similar to his role with CN; and

(g) Tommy Browning, former Assistant Vice President of Bulk Sales and Director of Coal at CN, left Defendants in 2013 to work for CP as Director of Sales and Marketing, Crude.

60. By enforcing the non-compete against Miller and not against similarly situated white employees, Defendants are interfering with Miller's future employment relationships because of his race.

61. On March 6, 2019, Miller filed the instant action alleging discrimination and retaliation under 42 U.S.C. § 1981, as well as intentional interference with business relationships under Tennessee state law. At the same time, Miller filed a charge for employment discrimination on the basis of race and retaliation with the Equal Employment Opportunity Commission ("EEOC").

62. On April 16, 2019, Defendants and newly-joined Plaintiff, CN subsidiary Grand Trunk Corporation ("Grand Trunk"), filed a Counterclaim and Third-Party Complaint against Miller. The counterclaim alleges breach of contract, fraudulent misrepresentation, and unjust enrichment. CN and Grand Trunk seek a declaratory judgment with respect to the enforceability of the non-compete covenants they claim applies to Miller, injunctive relief, economic damages in excess of $1 million, punitive damages, attorney's fees and costs.

63. CN and Grand Trunk filed these claims against Miller only after he filed this lawsuit alleging employment discrimination and retaliation, even though the alleged facts which form the basis of the counterclaims were known to Defendants in January 2019, long before Miller filed this lawsuit.

64. Defendants filed their claims in this lawsuit even though there is a pending lawsuit in Illinois state court brought by Miller seeking declaratory relief with respect to the enforceability of the non-compete covenants. Although Defendants could have brought their counterclaims in the Illinois case which is being asked to decide the same issue Defendants raise in their counterclaims (*i.e.*, the enforceability of the non-compete covenants), Defendants instead brought those claims in Miller's race discrimination lawsuit. This was done to retaliate against and punish Miller for bringing this lawsuit and for filing an EEOC charge accusing Defendants of race discrimination and retaliation.

### V. Claims

### COUNTS I AND II
### RACE DISCRIMINATION (COUNT I) AND RETALIATION (COUNT II) UNDER
### 42 U.S.C. § 1981

65. Miller incorporates paragraphs numbered 1-64 as if restated here.

66. 42 U.S.C. § 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

67. Miller is protected by Section 1981.

68. Defendants discriminated against Miller because of his race by not promoting him to the position of Vice President, Operations in 2015, 2016, and 2018.

69. Defendants are preventing Miller from accepting employment with CP and other competitors by attempting to enforce the non-compete covenant against him, solely because of his race.

70. Defendants are preventing Miller from accepting employment at CP and other competitors by enforcing the non-compete covenant against him in retaliation for Miller objecting to Defendants using his race in making employment decisions affecting him.

71. Defendants retaliated against Miller by threatening to sue Miller after they became aware that he had accepted employment with CP as Vice President of U.S. Operations.

72. Even though he withdrew his acceptance of that position in response to Defendants' threats, Defendants nevertheless counter-sued Miller in this case and seek injunctive relief and six figure damages. Defendants sued Miller only after he engaged in the protected activity of filing this lawsuit and an EEOC charge alleging race discrimination and retaliation even though they were aware of the alleged facts in support of their claims before this lawsuit was filed, and even though Miller had already commenced an action in IL seeking declaratory relief on the enforceability of the non-compete covenant. Defendants brought the claims against Miller *at this time* and *in this case* (as opposed to the Illinois case where the enforceability of the non-compete

covenants is the only issue) as a retaliatory action intended to intimidate and punish him for filing this lawsuit and the EEOC charge.

73. Defendants knowingly, intentionally, and willfully authorized the above adverse employment actions against Miller in violation of Section 1981. Defendants are aware that race discrimination is unlawful under federal civil rights laws.

74. Because of Defendants' actions, Miller has sustained damages from the loss of compensation and benefits he would have received, and the reputational and career advancement he would have realized, had he not been passed over for promotion to Vice President, Operations in 2015, 2016 and 2018.

75. Because of Defendants' actions, Miller has been unable to realize the financial opportunity presented to him by CP in the form of compensation and benefits he would have received, and the reputational and career enhancement he would have realized, had he not been prohibited from accepting CP's offer of employment to Vice President, Operations, or from accepting employment at another competitor of CN.

76. Because of Defendants' willful actions, Miller has suffered emotional distress.

## COUNT III
## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

77. Miller incorporates paragraphs 1-76 as if restated here.

78. Miller had a prospective business relationship with CP, based on CP's job offer, which Miller accepted and wanted to accept.

79. Defendants are aware of this business relationship.

80. Defendants intentionally interfered with this business relationship and prevented Miller and CP from entering into an employment relationship by threatening Miller with litigation to enforce the non-compete covenant and demanding that he repay the monies he realized upon

the exercise of his stock options. Defendants interfered with this business relationship by filing a counterclaim against Miller, seeking an excessive amount of damages and disgorgement of monies, in an effort to intimidate Miller and block him from accepting employment with CP.

81. Defendants' interference with Miller's existing and/or prospective business relationship with CP and the economic opportunity it afforded him was motivated, in whole or part, by Miller's race and/or in retaliation for Miller objecting to Defendants using his race in making employment decisions affecting him.

82. Defendants' motives and actions are improper and in violation of federal anti-discrimination laws.

83. Because of Defendants' actions, Miller has been unable to realize the financial opportunity presented to him by CP in the form of compensation and benefits he would have received, and the reputational and career enhancement he would have realized, had he not been prohibited from accepting CP's offer of employment to Vice President, Operations.

84. Because of Defendants' actions Miller has suffered emotional distress.

## VI. Jury Demand

Plaintiff demands that all issues of fact in this case be tried to a properly impaneled jury.

## VII. Prayer for Relief

WHEREFORE, Plaintiff Tracy Miller requests that the Court grant the following relief:

(a) Enter judgment in favor of Miller on all Counts;

(b) Award Miller the compensation and benefits he would have received from Defendants had he not been discriminatorily passed over for promotion to Vice President, Operations in 2015, 2016 and 2018;

  (c) Award Miller the compensation and benefits he would have received at CP had he been allowed to commence employment with CP on February 12, 2019, through the date Miller would have retired from CP;

  (d) Award Miller compensatory damages for the emotional distress and reputational injury he has suffered because of Defendants' unlawful conduct;

  (e) Award Miller punitive damages to punish and deter Defendants for their unlawful conduct;

  (f) Award Miller his costs and expenses of litigation;

  (g) Award Miller his reasonable attorneys' fees;

  (h) Award prejudgment [and post-judgment] interest, as provided by law; and

  (i) Award any further equitable or legal remedy the Court deems proper.

Dated: May 30, 2019

Respectfully submitted,

*/s/ Joe P. Leniski Jr.*
JOE P. LENISKI, JR. (BPR#22891)
PAMELA NEWPORT (OH 79427)
**BRANSTETTER STRANCH & JENNINGS, PLLC**
The Freedom Center
223 Rosa L. Parks Ave., Suite 200
Nashville, Tennessee 37203
(615) 254-8801
joeyl@bsjfirm.com
pamelan@bsjfirm.com

*ATTORNEYS FOR PLAINTIFF*

## CERTIFICATE OF SERVICE

The undersigned certifies the foregoing was filed with the Court's Case Management/Electronic Case Filing System, this 30th day of May, 2019, and served upon all counsel of record, including:

Paul E. Prather
LITTLER MENDELSON, PLC
3725 Champion Hills Drive
Suite 3000
Memphis, TN 38125

*/s/ Joe P. Leniski Jr.*
JOE P. LENISKI, JR.